**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| MATTHEW HOWELL,<br><br>          Plaintiff,<br><br>   v.<br><br>NORTH CAROLINA CENTRAL UNIVERSITY, and DEBRA SAUNDERS-WHITE, GREG MARROW, LEON LEWIS, CAMERON SEAY, BIJOY SAHOO, SYBIL HENDERSON, MARK STILEMEN, JOHN SMITH, SYLVIA ANDERSON, EVA KRAUS, LYNK BUTLER, DAPHINE RICHARDSON in their individual capacity,<br><br>          Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)        1:16CV576<br>)<br>)<br>)<br>) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Matthew Howell has alleged nine claims against Defendants North Carolina Central University ("NCCU") and Debra Saunders-White, Greg Marrow, Leon Lewis, Cameron Seay, Bijoy Sahoo, Sybil Henderson, Mark Stilemen, John Smith, Sylvia Anderson, Eva Kraus, Linc Butler[1], and Daphine Richards[2] in their individual capacities (collectively with NCCU referred to as "Defendants") related to his former employment at NCCU. This matter is before the Court on

---

[1] In their Motion to Dismiss, Defendants contend that, "[u]pon information and belief, the proper spelling of Mr. Butler's first name is 'Linc.'" (Mot. to Dismiss at 1 n.1.)

[2] Also in their Motion to Dismiss, Defendants refer to "Daphine Richards" as among the Defendants moving to dismiss the Complaint, but do not note that "Richards", as opposed to Richardson, is the proper spelling of this particular defendant's name. Therefore, it is unclear whether this reference is a typographical error or the true name of this Defendant.

Defendants' Motion to Dismiss ("Motion") [Doc. #17] pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons that follow, the Motion is granted.

I.

For purposes of evaluating a motion to dismiss, well-pled facts are accepted as true and construed in the light most favorable to Howell. Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009). Howell is an approximately forty-nine year old "African American and Indian" whose physical appearance is that of a Caucasian and who is commonly referred to in the workplace as Caucasian. (Compl. ¶¶ 6, 94 [Doc. #1].) On or about February 1, 2006, Howell accepted full-time employment at NCCU in its Information Technology Services ("ITS") Department as a computer consultant assigned to the Helpdesk. (Id. ¶¶ 30, 31.)

On or about May 5, 2006, the Assistant Provost contacted the Helpdesk for assistance with his computer that had been infected with spyware and pornography. (Id. ¶ 32.) Howell was attending the Helpdesk at the time, began working on the issues, and ultimately traced the path of the virus through NCCU's server and database. (Id.) He immediately contacted Greg Marrow, the Chief Investigation Officer of the ITS Department, to inform him that pornography had been downloaded on the computer server and NCCU computers. (Id. ¶ 33.) The State of North Carolina investigated the breach and uncovered pornography, theft

of copy-righted material, and theft of honest services. (Id. ¶ 34.)  At least one

manager was terminated, but no other managers were disciplined or jailed. (Id.)

Soon thereafter, on or about July 1, 2006, Howell received a 7 out of 7

performance score from Roger Daniels, the Information Technology Manager in the

ITS Department, and was reassigned to work as a field technician supporting the

campus faculty and staff. (Id. ¶ 35.)  Yet, just one month later, on or about

August 1, 2006, Daniels gave Howell a letter stating that he was terminated from

employment and refused to provide a justification for the termination. (Id. ¶ 36.)

At an unspecified time, Howell filed a grievance "noting gender discrimination"

because Howell's position was "transferred to a female staff employee." (Id. ¶ 37.)

At the hearing for his grievance, though, Howell presented copies of pornography

"as evidence of his illegal termination." (Id. ¶ 38.)  "The recommendation was to

reinstate" Howell, but Marrow refused to do so, "stating that Mr. Howell's

managers disliked him." (Id.)  The hearing ended in an impasse, so Howell filed the

paperwork for the second step of the mediation process and notified the North

Carolina State Auditors Hotline. (Id.)

"After further review," the then-Chancellor of NCCU reinstated Howell and

awarded him back pay "and time." (Id. ¶ 39.)  Howell returned to work on or about

November 1, 2006 in the School of Business, "[a]t the suggestion of Human

Resource[s]" "for fear of retaliation working under" Marrow. (Id.)  On or about that

same day, Daniels, Leon Lewis, Assistant Director of the ITS Department, and

Harry Monds, ITS Manager, met with Cameron Seay, Lead Professor of Computer

3

Information Systems in the School of Business, and Janius Montague, Director of Information Technology in the School of Business. (Id. ¶ 40.) Although there are no allegations of the reasons for or the substance of the meeting, Howell contacted Human Resources and the North Carolina State Auditors Hotline "immediately." (Id.) At an unspecified time, Howell "discovered that ITS was still selling movies[3] and Mr. Seay also had downloaded movies on his servers." (Id. ¶ 41.) Howell reported this information to the North Carolina Central Police and the North Carolina State Auditors Hotline. (Id.)

On or about February 2, 2007, Howell was again terminated. (Id. ¶ 42.) He contacted Human Resources and was directed to speak with NCCU's attorney. (Id.) In turn, Howell hired an attorney and "was asked to report back to work on or about April 1, 2007." (Id.) However, before he returned to work, on or about March 20, 2007, Seay "sent several slanderous emails regarding Mr. Howell's return to the School of Business as IT support", stating that Howell "made inappropriate and sometimes lewd comments to faculty, staff and students." (Id. ¶ 43.) Although Seay stated that this was documented, he provided no documentation to Human Resources when asked to do so. (Id.) Two days later, on or about March 22, 2007, Bijoy Sahoo, Dean of School of Business, "sent an email threatening Mr. Howell and banning him from the Office of Business Services." (Id. ¶ 44.)

---

[3] Howell does not allege what type movies these were.

On or about April 1, 2007, Howell returned to work and reported to Sybil Henderson in the School of Business. (Id.)  At an unspecified time, he requested a desktop audit to show his performance during the 2007-2008 period, but Daphine Richardson, "EEO", provided a false report of the audit which led to a negative performance evaluation with no pay increase. (Id. ¶ 46.)  Nevertheless, Henderson did give Howell a pay raise on or about May 1, 2008 as part of the "career banding raise across the system by the States Personnel." (Id. ¶ 47.)  However, not only did he not receive the back pay as part of the "career banding raise", but his pay increase was $4,000 less than "[a]ll other employees" in the ITS Department. (Id.)  Howell filed a grievance, but, as of the date he filed his Complaint, had not received a hearing, nor had his pay checks reflected the pay raise he did receive. (Id.)  "NCCU refused the back pay and equal pay settlement." (Id.)  After having filed several grievances, Howell's requests were ignored, and the grievances "disappeared from his personnel file." (Id. ¶ 48.)  He attempted to meet with Mark Stilemen, Human Resources Director, but to no avail. (Id.)

On or about June 1, 2009, "Henderson unduly scrutinized" Howell's telephone bill and apparently threatened to terminate him for theft of services. (Id. ¶ 49.)  Yet, after Howell's attorney contacted NCCU, Henderson stopped her threat. (Id.)  The following month, on or about July 1, 2009, Howell sent Sahoo a letter "regarding the hostile work environment, incorrect pay raise and back pay", after which Howell received back pay for July. (Id. ¶ 50.)  On or about October 1, 2009, Howell was transferred back to ITS. (Id. ¶ 51.)

Nearly four years later, on or about August 1, 2013, Howell "filed another grievance regarding the hostile work environment and bullying against John Nancy Smith, Chief Information Officer in the ITS Department." (Id. ¶ 52.) Howell spoke with Sylvia Anderson, Director of "EEO," who ignored the grievance "regarding the hostile work environment", and Howell "did not receive a hearing within the NCCU's policy of forty-five days." (Id.)

On or about May 5, 2014, Howell met with Eva Kraus, current Chief Information Officer of the ITS Department[4], and was given notice of Reduction in Force ("RIF"), presumably terminating Howell. (Id. ¶ 53.) However, the following day, Kraus created three new jobs and awarded some employees raises. (Id.) On or about May 15, 2014, Howell filed a grievance about the RIF, and a hearing was held on August 20, 2014 with Linc Butler, current[5] Human Resources Director, and Kraus present. (Id. ¶ 54.) Kraus would not offer Howell his previous position, and, although he "had applied for all the jobs that had posted at NCCU during the period[6]", he was not hired. (Id.) He "immediately" filed for the second step in the mediation policy. (Id.) On or about October 20, 2014, Howell "had a hearing" with Kraus who, once again, would not offer him his previous position. (Id. ¶ 55.) Howell told Kraus that several employees had been promoted and temporary

---

[4] It is unclear if the allegation of "current Chief Information Officer" refers to "current" as of May 5, 2014 or "current" as of the date that Howell filed his Complaint.

[5] See supra n.4.

[6] It is unclear to what "period" Howell refers.

employees had been hired "contrary to the RIF regulations." (Id. ¶¶ 53, 55.)

Approximately two months later, on or about December 22, 2014, Howell's

grievance was denied. (Id. ¶ 55.)

On or about February 1, 2015, Howell received a letter from NCCU

informing him that he was not hired for the position for which he had applied[7]. (Id.

¶ 56.)  The person who was hired for the position was more than thirty years

younger than Howell. (Id.)  Three weeks later, on or about February 24, 2015, he

filed a grievance "alleging that he had RIF priority, and the RIF was harassment,

hostile working conditions, failure to follow Human Resources policy and state

policy, and age discrimination." (Id.)  On or about April 1, 2015, Howell's "claim"

was denied, after which he filed "for a mediation" that was held on or about May

28, 2015 to no avail. (Id. ¶¶ 57, 58.)  NCCU repeatedly failed to address Howell's

grievances or concerns about pay and retaliatory harassment. (Id. ¶ 59.)

Howell filed a charge of discrimination with the Equal Employment

Opportunity Commission ("EEOC")[8] in which, at least as he alleges in his

Complaint, he asserted age, race, and retaliation discrimination. (Id. ¶ 60.)  On or

about March 8, 2016, he received his right to sue letter (Ex. 1 to Compl. [Doc. #1-

1]), after which he filed the instant action.  He has alleged (1) whistleblower

retaliation in violation of Title VII of the Civils Rights Act of 1964 ("Title VII"), (2)

_____

[7] It is unclear to what "position" Howell is referring.

[8] Howell neither alleges the date that he filed his charge nor attaches a copy of his charge to the Complaint.

race discrimination in violation of Title VII, (3) retaliation in violation of Title VII, (4) age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), (5) retaliation in violation of the ADEA, (6) gender discrimination in violation of the "Gender Discrimination in Employment Act", (7) violation of equal protection pursuant to Fourteenth Amendment and 42 U.S.C. § 1981, (8) wrongful discharge, and (9) violation of the North Carolina Wage and Hour Act.

## II.

Defendants first argue that Howell failed to exhaust his administrative remedies as to his claims of race discrimination under Title VII and age discrimination under the ADEA in Counts 2, 4, and 5, respectively. Title VII prohibits employment discrimination on the basis of race, color, religion, sex, or national origin, 42 U.S.C. § 2000e-2(a), and the ADEA prohibits employment discrimination on the basis of age, 29 U.S.C. § 623. However, before instituting a civil action alleging violations of Title VII or the ADEA, an individual must first file a Charge of Discrimination with the EEOC or, in other words, exhaust his administrative remedies. See 42 U.S.C. § 2000e-5 (Title VII); 29 U.S.C. § 626 (ADEA); Jones v. Calvert Grp., Ltd., 551 F.3d 297, 300 (4th Cir. 2009). The contents of the charge determine the "scope of the plaintiff's right to file a federal lawsuit". Jones, 551 F.3d at 300; see also Chacko v. Patuxent Inst., 429 F.3d 505, 506 (4th Cir. 2005) (stating that the "charge frames the scope of future litigation"). "Only those discrimination claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable

investigation of the original complaint may be maintained in a subsequent Title VII [or ADEA] suit." Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 963 (4th Cir. 1996); see also Chacko, 429 F.3d at 506 (holding that a plaintiff fails to exhaust his administrative remedies where the charge references "different time frames, actors, and discriminatory conduct than the central factual allegations in his formal suit"). Therefore, the Fourth Circuit Court of Appeals has found claims that allege different bases for discrimination than were alleged in the charge or that allege different types of discrimination than were alleged in the charge as barred. Chacko, 429 F.3d at 509 (citing cases). "[A] failure by the plaintiff to exhaust administrative remedies concerning a Title VII [or ADEA] claim deprives the federal courts of subject matter jurisdiction over the claim." Jones, 551 F.3d at 300-01.

## A.

In support of their argument, Defendants attached to their Motion a copy of Howell's Charge of Discrimination filed with the EEOC on August 20, 2015, (Ex. 1 to Mot. to Dismiss [Doc. #17-1]), and argue that the Court can properly consider it, (Defs.' Mem. of Law in Supp. of Mot. to Dismiss ("Defs.' Br. in Supp.") at 5 n.2 [Doc. #18]). Howell argues otherwise, (Pl.'s Mem. Opposing Mot. to Dismiss ("Pl.'s Br. in Opp'n") at 2-3 [Doc. #20]), but nevertheless cites to the exhibit in his brief, (id. at 4).

A court may consider a document attached to a motion to dismiss if it is "integral to the complaint and there is no dispute about the document's authenticity." Goines v. Valley Cmty. Servs. Bd., 822 F.3d 159, 166 (4th Cir.

2016); see also Robinson v. Durham Pub. Sch. Bd. of Educ., No. 1:13CV652, 2014 WL 3894368, at *4 n.3 (M.D.N.C. Aug. 7, 2014) (considering an EEOC Charge that the defendant attached to the motion to dismiss because the plaintiff relied on the Charge for exhaustion of administrative remedies and the plaintiff did not appear to contest the authenticity of the Charge as he relied on it in his opposition to the motion to dismiss). Howell alleged that he filed a Charge with the EEOC and thereafter received his right to sue letter, prerequisites to his filing the instant action. In addition to his reliance on the Charge for that purpose, he cited Defendants' exhibit of the Charge in his opposition brief and did not contest its authenticity. In support of the exhibit's authenticity, the Charge number, 433-2015-02775, is the same Charge number on Howell's right to sue letter that he attached to his Complaint. Therefore, the Court will consider the EEOC Charge that Defendants attached to their Motion.

### B.

### 1.

According to Defendants, Howell did not exhaust his administrative remedies as to his claim in Count 2 of race discrimination in violation of Title VII. They argue that he not only failed to check the box on his Charge for race discrimination, but he also failed to raise the claim in the Charge. (Defs.' Br. in Supp. at 8.) Because "[t]here is no reference in the charge to any alleged actions taken by NCCU or any of its employees that were based on race", (id.), Defendants conclude that the claim must be dismissed.

In response, Howell acknowledges that he checked the box for color discrimination and described color discrimination in the Charge. (Pl.'s Br. in Opp'n at 4.) He also argues that "it is undisputed that Defendants treated him unfairly based on his color." (Id.) Then, confusingly, he never mentions color again in his brief and, instead, argues that he alleged in his Charge that "he was discriminated against on the basis of his race", (id. at 4-5), and erroneously cites to the Complaint in support of those arguments[9], (id. at 5).[10]

"Even though race and color clearly overlap, they are not synonymous." EEOC Compliance Manual, § 15-III at 15-6 (Apr. 19, 2006). In its Compliance Manual, the EEOC explains that, while Title VII does not define "color", courts and the EEOC "read 'color' to have its commonly understood meaning – pigmentation, complexion, or skin shade or tone." § 15-III at 15-6. Compare id. with id. § 15-II at 15-3 (referencing five racial categories provided by the Office of Management and Budget – American Indian or Alaska Native, Asian, Black or African American, Native Hawaiian or Other Pacific Islander, and White – and one ethnic category –

_____

[9] Howell cites to the Complaint in support of arguments about similarly situated "African American" employees and peers, suggesting that he made such allegations in his Complaint, but he did not. Furthermore, he also includes in his brief additional, unsupported statements about race that are also not alleged in the Complaint.

[10] He also requests that the Court "apply the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 . . . (1973)." (Pl.'s Br. in Opp'n at 4-5.) "In the employment context, however, a plaintiff need not establish a prima facie case under McDonnell Douglas in order to survive a motion to dismiss." Miller v. Carolinas Healthcare Sys., 561 F. App'x 239, 241 (4th Cir. 2014) (unpublished).

Hispanic or Latino). "[C]olor discrimination occurs when a person is discriminated against based on the lightness, darkness, or other color characteristic of the person." Id. The Fourth Circuit Court of Appeals has likewise explained, "Color discrimination arises when the particular hue of the plaintiff's skin is the cause of the discrimination, such as in the case where a dark-colored African-American individual is discriminated against in favor of a light-colored African-American individual." Bryant v. Bell Atl. Md., Inc., 288 F.3d 124, 132 n.5 (2002); see also Williams v. Wendler, 530 F.3d 584, 587 (7th Cir. 2008) ("Light-skinned blacks sometimes discriminate against dark-skinned blacks, and vice versa, and either form of discrimination is literally color discrimination.").

Similar to Howell, the plaintiff in Jones v. Jefferson Parish, No. 12-2191, 2013 WL 871539, at *4 (E.D. La. Mar. 8, 2013), checked the boxes on his two formal EEOC charges for discrimination based on color and retaliation, but, as is relevant here, did not check the box for race. In the narrative, he never mentioned race discrimination and concluded that he had "been discriminated against because of [his] color, light skinned, and retaliated against for opposing practices made illegal under Title VII." Id. His attachments to the charge mentioned discrimination "'based on color . . . as compared to darker employees'" but not discrimination based on race. Id. The plaintiff subsequently filed a complaint against the defendant-employer alleging, among other things, what could have been interpreted as discrimination based on race and argued that the scope of his EEOC charge and the related investigation were broad enough to include his claim of

12

race-based discrimination. Id. at *3. The court disagreed, found that he "clearly never filed a charge of discrimination based on . . . race", and dismissed the claim because, assuming he did not abandon the claim by failing to brief the issue, he failed to exhaust his administrative remedies as to that claim. Id. at *5. Cf., e.g., Bryant, 288 F.3d at 132 n.5 (finding that the plaintiff failed to exhaust his administrative remedies as to his claim for color discrimination, among others, because he only alleged race discrimination in his EEOC Charge and "did not indicate that he was discriminated against on the basis of his skin color", and, as such, his Charge was "devoid of any hint that his particular skin tone motivated the alleged discrimination"); Daniels v. James Lawrence Kernan Hosp., Inc., No. No. WMN-15-255, 2015 WL 5735397, at *3 (D. Md. Sept. 29, 2015) (quoting Bryant in support of dismissing the plaintiff's color discrimination claim because she stated in her charge that she was discriminated against due to "race, Black" when she was terminated and three Caucasians were not and failed "to put forth a specific allegation describing color discrimination or showing how color discrimination was related to her allegation that she was discriminated against" and describing the "[p]laintiff's assertion that the text of her EEOC charge plainly allege[d] discrimination on the basis of color" as "her conflation of race and color discrimination"); Richardson v. HRHH Gaming Senior Mezz, LLC, 99 F. Supp. 3d 1267, 1273-74 (D. Nev. 2015) (dismissing the plaintiff's color discrimination claim, finding that the plaintiff's charge was "devoid of allegations of discrimination based on skin tone" and that he instead alleged that he was

13

discriminated against "because of [his] race, Black", and concluding that because there were no allegations in the charge that "would allow the EEOC to infer and investigate a claim of color discrimination, [the] color discrimination is not like or reasonably related to his EEOC charge"); <u>Cooper v. Jackson-Madison Cty. Gen. Hosp. Dist.</u>, 742 F. Supp. 2d 941, 950-51 (W.D. Tenn. 2010) (finding that the plaintiff failed to exhaust his administrative remedy for color discrimination because he alleged in his charge that he was discriminated against by an African-American director because of his Caucasian race not "because he was, for example, a fair-skinned Caucasian" and citing the EEOC's compliance manual and <u>Bryant</u>, among other cases).

Here, represented by counsel at the time he filed his Charge with the EEOC, Howell only checked the boxes for color and retaliation. (Ex. 1 at 1.)  In relevant part, he alleged in his narrative,

> The petitioner experienced continuing violations of unlawful workplace 'color-based discrimination' against persons that appear white.  Here, the petitioner attests being part African American and part American Indian.  Color animus of NCCU is direct discrimination on this face by NCCU against employees, such as the petitioner through his employment.  The animus statements of the NCCU Chancellor are available . . . .

(<u>Id.</u> at ¶ 3.)  He never checked the box for race, and, other than describing himself as part African American and part American Indian as context for his color discrimination claim, his factual allegations were not of race discrimination. Instead, he specifically referred to and quoted "color-based discrimination", defined it as being "against persons that appear white", and accused NCCU of direct

14

discrimination with its "[c]olor animus". These allegations focus on "the particular hue" of his skin. Based on these allegations, a reasonable investigation by the EEOC would not have developed into an investigation of race discrimination. Consequently, Howell failed to exhaust his administrative remedies as to his claim of race discrimination. Therefore, to the extent that Howell alleges race discrimination in Count 2, Defendants' motion to dismiss the claim is granted.

2.

To the extent that Howell has actually alleged a claim of color, rather than race, discrimination in Count 2, the claim must still be dismissed for failure to state a claim upon which relief can be granted. The Fourth Circuit Court of Appeals has recognized that "[l]egal labels characterizing a claim cannot, standing alone, determine whether it fails to meet" the pleading standard. Labram v. Havel, 43 F.3d 918, 920 (1995). This is true "[e]ven where such a label reflects a flat misapprehension by counsel respecting a claim's legal basis . . . so long as any needed correction of legal theory will not prejudice the opposing party." Id. "All that is required is that the pleaded claim afford 'the opposing party fair notice of the nature and basis or grounds of the claim and a general indication of the type of litigation involved.'" Id. Therefore, although Howell entitles Count 2 as race discrimination in violation of Title VII, this mischaracterization, standing alone, will not lead to the claim's dismissal as long as Defendants are on notice of the actual nature and bases for the claim of color discrimination.

Howell alleges, albeit incorrectly, that his EEOC Charge included a claim of race discrimination and then, in Count 2, alleges that he "is an African-American and American Indian male" whose "physical appearance is of Caucasian [sic]". (Compl. ¶¶ 60, 72.)  He further alleges that he was "referred to at all relevant times at NCCU as Caucasian"; "NCCU singled Mr. Howell out by his physical appearance as a Caucasian male"; and "Defendants treated Mr. Howell less favorably than similarly situated employees who are African-American and has [sic] the physical appearance of an African American." (Id. ¶¶ 72-74.)  These allegations, as well as his arguments in support of having alleged a race discrimination claim, (see Pl.'s Br. in Opp'n at 4-5), conflate race and color discrimination.  Nevertheless, these allegations suggest, if anything, color discrimination, a claim of which Defendants, or at least NCCU, had notice as a result of Howell's EEOC Charge and the EEOC's related investigation.  Accordingly, and as evidenced by their arguments challenging a claim for color discrimination, Defendants are not prejudiced by the Court's interpreting these allegations as asserting a claim of color discrimination.  Yet, assuming arguendo that this claim is not time-barred as Defendants argue, Defendants also argue that Howell has failed to "include any facts to support a claim of color . . . discrimination", (Defs.' Br. in Supp. at 11).  The Court agrees.

To survive a Rule 12(b)(6) motion, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v.

Twombly, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556); see also McCleary-Evans v. Md. Dep't of Transp., State Highway Admin., 780 F.3d 582, 585 (4th Cir. 2015) (noting that a complaint must "contain[] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face in the sense that the complaint's factual allegations must allow a court to draw the reasonable inference that the defendant is liable for the misconduct alleged").  When evaluating whether the complaint states a claim that is plausible on its face, the facts are construed in the light most favorable to the plaintiff and all reasonable inferences are drawn in its favor. U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency, 745 F.3d 131, 136 (4th Cir. 2014).  Nevertheless, "labels and conclusions[,]" "a formulaic recitation of the elements of a cause of action[,]" and "naked assertions . . . without some further factual enhancement" are insufficient. Twombly, 550 U.S. at 557.

In support of Howell's claim of color discrimination, he needs to have alleged "facts to satisfy the elements of the cause of action created by that statute", McCleary-Evans, 780 F.3d at 585, that Defendants "discriminate[d] against [him] with respect to his compensation, terms, conditions, or privileges of employment, because of [his] . . . color . . . ", 42 U.S.C. § 2000e-2(a)(1).  He has not done so. While he alleges that he did not receive the same pay increase as his colleagues and that he was terminated several times, he has not alleged any facts to support

that Defendants took any of these actions, or any other actions, because of his color.  The only allegations about his color are either the allegations describing himself, (Compl. ¶¶ 6, 72), general, unsupported, speculative references within Count 2 to his being singled out and treated less favorably because of his physical appearance, (id. ¶¶ 73, 74), or the unsupported, highly incendiary allegation within Count 2 that "Defendants have a notorious reputation for discriminating against its [sic] Caucasian employees in favor of its [sic] African American employees", (id. ¶ 78).  In sum, even if the Court were to construe Count 2 as a claim of color discrimination in violation of Title VII, it must be dismissed for failure to state a claim for which relief can be granted.  There is no need to discuss Defendants' additional challenge to the claim.

## C.

As they did with Howell's claim of race discrimination, Defendants contend that Howell failed to exhaust his administrative remedies as to his claims in Counts 4 and 5 of age discrimination and retaliation related to age discrimination.  Not only did he not mark the box on his EEOC Charge for age discrimination, but Defendants argue that the Charge did not refer to age discrimination or retaliation related to age discrimination. (Defs.' Br. in Supp. at 14-15.)  Therefore, according to Defendants, the claims should be dismissed. (Id. at 15.)

It is difficult to discern if Howell's brief in opposition to Defendants' motion includes a response to this particular challenge. (See Pl.'s Br. in Opp'n at 9-10.)  As Defendants suggest, though, (Defs.' Reply Mem. of Law in Supp. of Mot. to

Dismiss at 7-8 [Doc. #21]), Howell apparently argues that Defendants should have been on notice about his age discrimination claim because his February 2015 internal grievance about the Reduction in Force included a reference to age discrimination, (see Pl.'s Br. in Opp'n at 10).

Filing an internal grievance that purportedly put Defendants on notice is not the equivalent of exhausting administrative remedies under the ADEA. Instead, Howell was required to file a charge with the EEOC alleging age discrimination. (See supra § II at 8-9.) In his brief, he does not even argue that his Charge included any allegation of age discrimination, which is understandable because he could not successfully advance such an argument. Not only did he not check the box for "age", but he did not include any allegations of age discrimination in his narrative that would have led a reasonable EEOC investigation to develop into an investigation of age discrimination. His only reference to age in his EEOC charge is in passing when he alleges that his June 2015 grievance and mediation hearing was a "sham", in part, because "[t]he mediation panel would only discuss age discrimination which was not the only issue for this grievance". (Ex. 1 to Mot. to Dismiss at 6.) Therefore, because Howell has failed to exhaust his administrative remedies as to age discrimination and retaliation based on age discrimination, Defendants' motion to dismiss Counts 4 and 5 is granted, and there is no need to discuss Defendants' other challenges to these claims.

III.

Defendants also challenge Howell's claim in Count 1 for "whistleblower retaliation" in violation of Title VII. They argue that, although Title VII prohibits retaliation against an employee for engaging in protected activity, Howell's "alleged 'whistleblowing activity' related to his finding pornographic materials on NCCU's server and reporting that to his supervisor and State authorities" "clearly does not constitute 'protected activity' under Title VII." (Defs.' Br. in Supp. at 9-10.) Accordingly, they contend that this claim should be dismissed.

In response, Howell ignores Defendants' argument that his alleged protected activity is not the type of activity protected under Title VII. Instead, he simply repeats his allegations as argument: he "reported illegal activity that was occurring on the computers at NCCU and the illegal download of movies", after which he was harassed and ultimate terminated. (Pl.'s Br. in Opp'n at 9.[11]) He concludes by arguing that he "was terminated from his employment or treated adversely by Defendants because of his opposition to activity made unlawful under Title VII." (Id.)

As Defendants acknowledge, Title VII provides, in relevant part, "It shall be an unlawful employment practice for an employer to discriminate against any of his

---

[11] As he did when arguing in support of his Title VII race discrimination claim, (see supra 11 n.10), Howell once again "ask[s] the Court to review the burden-shifting framework of McDonnell Douglas Corp.", 411 U.S. 792, and then argues that Defendants have not met their burden. As explained above, though, this framework is not appropriate for a motion to dismiss analysis.

employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a) (referring to subchapter VI entitled "Equal Employment Opportunities"). "[U]nlawful employment practice[s]" in subchapter VI are those that adversely affect employment on the basis of <u>an individual's race, color, religion, sex, or national origin</u>. <u>See</u> 42 U.S.C. § 2000e-2 (emphasis added). It follows that activity protected from retaliation under Title VII is either opposing an employer's actions taken on the basis of an individual's race, color, religion, sex, or national origin or participating in an investigation of such conduct. In fact, this type of retaliation is what Howell alleges in Count 3.

However, although Howell repeatedly and only refers to Title VII in this claim of <u>whistleblower</u> retaliation, Title VII does not protect the activity in which Howell alleges he participated or opposed. In his Complaint, Howell alleges that he "engaged in protected whistleblower activity by notifying his superior of pornographic materials on the NCCU server and employees' computer which caused an investigation." (Compl. ¶ 64.) "As a result of [his] discovery and notification, [he] was retaliated against by several employees and transferred to another Department. After being transferred to another Department, the same protected activity was ongoing. [He] reported this activity again." (<u>Id.</u> ¶ 65.) After alleging his injuries, he alleges that he "would not have suffered all of the

adverse actions in the absence of his protected whistleblower conduct" and that

NCCU engaged in "unlawful whistleblower retaliation . . . in violation of Title VII".

(Id. ¶¶ 67, 69.)

Howell's mistaken conviction in his Complaint and his brief that his claim of

whistleblower retaliation may be brought according to Title VII does not doom the

claim, though. As previously explained, a claim should not be dismissed solely

because it is mislabeled and even when it "reflects a flat misapprehension by

counsel respecting a claim's legal basis", as long as the facts and claim alleged set

out a recognized violation of the law and the defendant is on "fair notice of the

nature and basis or grounds of the claim" and has "a general indication of the type

of litigation involved." Labram, 43 F.3d at 920. Howell's allegations fairly clearly

suggest that he is asserting retaliation in violation of what is referred to as North

Carolina's Whistleblower Act, N.C. Gen. Stat. §§ 126-84 and 126-85, that

protects state employees who report to public bodies matters of public concern.

See Newberne v. Dep't of Crime Control & Pub. Safety, 618 S.E.2d 201, 205-06

(N.C. 2005) (providing elements of a claim under the Whistleblower Act).

Were Howell to have plausibly alleged a claim of retaliation in violation of

North Carolina's Whistleblower Act, which the Court is not determining, the claim

is time-barred because the Complaint was filed more than "one year after the

occurrence of the alleged violation" of the Act. See N.C. Gen. Stat. § 126-86; see

also Phillips v. N.C. A&T State Univ., No. 1:09CV227, 2009 WL 5215377, at *4

n.1 (M.D.N.C. Dec. 28, 2009) (finding that, had the plaintiff alleged a

whistleblower claim, it would have been barred by the statute of limitations because he was terminated in February 2007 but did not file his complaint until March 30, 2009). Howell filed his Complaint on June 5, 2016, well over a year after his being denied on February 1, 2015 the last position for which he applied after the reduction in force, (Compl. ¶ 56). Even were the final failed mediation on May 28, 2015 to be considered whistleblower retaliation, (id. ¶ 58), that event does not save the untimely assertion of the claim. Therefore, although Howell's whistleblower claim has been characterized as one recognized under North Carolina law, it is ultimately barred by the statute of limitations, and Defendants' motion to dismiss Count 1 is granted. There is no need to discuss Defendants' other challenge to this claim.

IV.

Defendants also contend that Howell's claim in Count 6 of gender discrimination, entitled "Violation of the Gender Discrimination in Employment Act" and brought pursuant to 29 U.S.C. §§ 621-634 (the ADEA), does not exist under the ADEA. (Defs.' Br. in Supp. at 16.) Howell does not respond to this challenge. Pursuant to Local Rule 7.3(k), failure to respond permits the motion to dismiss to be considered and decided as uncontested and ordinarily granted without further notice. Not only does Rule 7.3(k) permit dismissal, but the law also requires dismissal.

As Defendants argue, "the ADEA is intended specifically to protect applicants and employees from discrimination on the basis of age, not gender."

(Defs.' Br. in Supp. at 16.) "Title VII is the proper vehicle for asserting a gender discrimination claim." (Id.) In support of Howell's claim for a violation of the "Gender Discrimination in Employment Act", he alleges that he "is a male, and therefore comes under the protection of the Gender Discrimination in Employment Act, 29 U.S.C. §621-634." (Compl. ¶ 102.) "Defendants were aware of [his] gender", and he was treated less favorably than similarly situated female employees. (Id. ¶¶ 103, 104.) Despite the confounding pursuit of this claim under the "Gender Discrimination in Employment Act" as found in 29 U.S.C. §§ 621-623, which is actually the ADEA, it is clear that Howell is not bringing a claim under the ADEA, but, instead, is more likely bringing a gender discrimination claim under Title VII. Even if Count 6 were deemed to be a claim for gender discrimination in violation of Title VII, see Labram, 43 F.3d at 920, it is apparent from Howell's EEOC charge that he did not exhaust his administrative remedies as to gender discrimination. Not only did he not check the box for sex, but the only reference to gender discrimination in the narrative is his allegation that he filed an internal grievance in August 2006 for gender discrimination when a female was given his job. (Ex. 1 at 1, 2 ¶ 2.) Were such an allegation sufficient to find that Howell exhausted his remedies for gender discrimination, the claim is clearly time-barred, (see infra § IV). (See Compl. ¶ 37 (alleging that Howell filed an internal grievance "noting gender discrimination" sometime around August 2006).) Accordingly, Defendants' motion to dismiss Count 6 is granted. There is no need to discuss Defendants' additional challenge to this claim.

IV.

Of Howell's Title VII and ADEA claims, only his claim in Count 3 for retaliation under Title VII thus far remains. Defendants argue that this claim is time-barred because "all of the alleged discriminatory or retaliatory conduct occurred beyond the 180 days of filing of Plaintiff's EEOC Charge." (Defs.' Br. in Supp. at 9.) Specifically, Defendants argue that because Howell filed his charge on August 20, 2015, "any acts that occurred prior to February 21, 2015 fall outside of the time limitation period." (Id.)

In response, Howell argues the "where there is a state or local agency with authority to grant relief, the charge must be filed, with state or local agency, within three hundred (300) days after the alleged unlawful employment practice occurred." (Pl.'s Br. in Opp'n at 5.) This permits the inclusion of retaliatory conduct dating back to October 24, 2014. (Id.) Apparently in the alternative, Howell argues that his "attend[ing] mediation to no avail" on May 28, 2015 falls within the 180 day filing period and is the date that he "was informed of the discriminatory employment decision". (Id. at 7-8.) He then proffers an argument for equitable tolling because he "was induced to believe that he had to exhaust his administrative remedies with his employer before seeking his claim with the EEOC." (Id. at 8.)

Title VII requires that "[a] charge under this section be filed within one hundred and eighty days after the alleged unlawful employment practice occurred . . . ." 42 U.S.C. § 2000e-5(e)(1). However, when a "person aggrieved"

by an unlawful employment practice "has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice . . . such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred . . . ." Id. In North Carolina, the Office of Administrative Hearings serves as "the State's deferral agency for cases deferred by the [EEOC] . . . as provided in . . . 42 U.S.C. § 2000e-5." N.C. Gen. Stat. § 7A-759(a); see also Bratcher v. Pharm. Prod. Dev., Inc., 545 F. Supp. 2d 533, 543 (E.D.N.C. 2008) (explaining that the Office of Administrative Hearings has subject matter jurisdiction over a charge made by a state employee).

Howell has neither alleged that he filed a charge with a state agency or more specifically, the Office of Administrative Hearings, nor that the EEOC did so on his behalf. Instead, he alleges that he filed internal grievances with NCCU, which repeatedly failed to address the grievances, and, "[i]n light of all the above", he filed a charge with the EEOC. (Compl. ¶¶ 59, 60.) Although he cites the statute prescribing a 300-day filing period, he actually does not advance an argument that such a filing period applies in this case, nor could he based on his allegations. Instead, the 180-day filing period applies.

"Equitable tolling applies where the defendant has wrongfully deceived or misled the plaintiff in order to conceal the existence of a cause of action." English v. Pabst Brewing Co., 828 F.2d 1047, 1049 (4th Cir. 1987). It is "a narrow limitations exception", Olson v. Mobil Oil Corp., 904 F.2d 198, 201 (4th Cir.

1990), and does "not extend to what is at best a garden variety claim of excusable neglect", Irwin v. Dep't of Veterans Affairs, 498 U.S. 89, 96 (1990). Although Howell argues that, "In this particular set of facts, Plaintiff was induced to believe that he had to exhaust his administrative remedies with his employer before seeking his claim with the EEOC", (Pl.'s Br. in Opp'n at 8), he alleges no facts in his Complaint to support such an assertion. Therefore, equitable tolling does not apply here. See Williams v. Giant Food Inc., 370 F.3d 423, 430 n.4 (4th Cir. 2004) (deeming the plaintiff's equitable tolling argument abandoned on appeal but then noting that "[i]n any event, we conclude that tolling is not appropriate here, because Williams did not allege that Giant Food deceived or misled her about its promotion selections 'in order to conceal the existence of a cause of action'").

Having determined that equitable tolling is not appropriate and that the 180-day limitations period for filing a charge with the EEOC applies, the next question is whether any of the alleged adverse employment actions are timely. "[E]ach retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice'" such that a party "can only file a charge to cover discrete acts that 'occurred' within the appropriate time period." Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 114 (2002). A party must file a charge with the EEOC within 180 days of the date that a discrete retaliatory act occurred or, in other words, happened. Id. at 110. Discrete acts of retaliation include termination, failure to promote, and denial of transfer. Id. at 114. "[T]he filing period runs from the time at which the employee is informed of the allegedly

27

discriminatory employment decision, regardless of when the effects of that decision come to fruition." Price v. Litton Bus. Sys., Inc., 694 F.2d 963, 965 (4th Cir. 1982) (citing Del. State Coll. v. Ricks, 449 U.S. 250 (1980)).

Because Howell filed his charge with the EEOC on August 20, 2015, a retaliatory act had to have occurred on or after February 21, 2015. In his claim of retaliation, Howell alleges that he was "threatened, slandered, subjected to heightened scrutiny, negative evaluations, change in job duties, adversely negative pay raise, harassed, and was ultimately terminated on four separate occasions" apparently in retaliation for filing internal grievances. (Compl. ¶¶ 80-83.) According to these allegations, the most recent retaliatory act would be his final termination on May 5, 2014 as a result of the reduction in force, and that act is time-barred. (See id. ¶ 53.) Even if the Court were to consider Howell's February 1, 2015 receipt of the letter notifying him that he was not hired for the most recent position for which he applied after the reduction in force, (id. ¶ 56), the retaliation claim is still time-barred.

Howell argues that he was "informed of the discriminatory employment decision on the 28th day of May, 2015", (Pl.'s Br. in Opp'n at 8), the date that he alleges mediation was held to no avail, (Compl. ¶ 58). He also refers to June 15, 2015 as a hearing date with Defendants, (Pl.'s Br. in Opp'n at 6), but there is no allegation in his Complaint of Defendants doing anything after May 28, 2015, (Compl. ¶ 58), much less on June 15, 2015. Nevertheless, even considering the May 28, 2015 mediation, the claim is time-barred. "[T]he pendency of a

grievance, or some other method of collateral review of an employment decision, does not toll the running of the limitations period." Del. State Coll., 449 U.S. at 506. In addition, the grievance that formed the basis for that mediation was filed in response to Howell's receipt on February 1, 2015 of the letter informing him that he was not hired for the position for which he applied. (Id. ¶ 56.) Therefore, as of February 1, 2015, Howell was informed of the discriminatory act – the failure to hire him, and that is the date that the filing period began to run, regardless of when the effects of that decision came to fruition such as at the conclusion of the internal grievance process. See Del. State Coll., 449 U.S. at 505-06 ("[E]ntertaining a grievance complaining of the [discriminatory] decision does not suggest that the earlier decision was in any respect tentative. The grievance procedure, by its nature, is a remedy for a prior decision, not an opportunity to influence that decision before it is made.)

In their Reply Brief, Defendants give Howell the benefit of having asserted a continuing violation in an attempt to avoid the time bar, but argue that Howell has not sufficiently alleged such a violation. (Defs.' Reply Br. at 5-6 (citing Pl.'s Br. in Opp'n at 6-7).) To the extent that Howell has alleged a continuing violation separate from the discrete retaliatory acts Defendants are alleged to have committed, such as Seay's slanderous emails on March 20, 2007, Sahoo's threatening email on March 22, 2007, Richardson's false desktop audit sometime in 2007 or 2008, or Henderson's undue scrutiny of Howell's telephone usage on June 1, 2009, none of Defendants' acts is timely such that it could save a

continuing violation claim. See Nat'l R.R. Passenger Corp., 536 U.S. at 117 (permitting "the entire time period of the hostile environment" to be considered "[p]rovided that an act contributing to the claim occurs within the filing period"). Therefore, Defendants' motion to dismiss Count 3 is granted, and there is no need to discuss Defendants' other challenges to this claim.

V.

Defendants next argue that Howell's equal protection claim in Count 7 brought pursuant to 42 U.S.C. § 1981 "must be dismissed because 42 U.S.C. § 1983 is the exclusive remedy against a state for a violation of a person's constitutional rights." (Defs.' Br. in Supp. at 16.)  Although Defendants entitle this section of their brief, "PLAINTIFF CANNOT STATE A SECTION 1981 CLAIM AGAINST NCCU", they conclude their legal argument by stating, "Plaintiff cannot pursue a direction section 1981 claim against the State Defendants." (Id. at 16, 17 (emphasis added).)  Therefore, the argument is interpreted as one made by all Defendants.  Nevertheless, Howell fails to respond at all to this challenge. Accordingly, as noted above, the claim can be dismissed pursuant to Local Rule 7.3(k); yet, addressing Defendants' argument also supports dismissal.

The United States Supreme Court has held "that the express cause of action for damages created by § 1983 constitutes the exclusive federal remedy for violation of the rights guaranteed in § 1981 by state governmental units". Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 733 (1989); see also Googerdy v. N.C. A&T State Univ., 386 F. Supp. 2d 618, 624-25 (M.D.N.C. 2005) (dismissing the

30

plaintiff's claim brought pursuant to § 1981 against the defendant, an alter ego of the State of North Carolina, because § 1983 provides the exclusive remedy against state actors for violations of § 1981 rights).  In Jett, the Court explained that, while it had recognized a damages remedy as § 1981 and § 1982 applied to private actors, it "had little choice but to hold that aggrieved individuals could enforce this prohibition [on private actors' violation of rights], for there existed no other remedy to address such violations in the statute." 491 U.S. at 731-32.  But, that "is manifestly not the case" with state actors' alleged violation of rights protected by § 1981. Id. at 732.  Instead, the Court found "very strong evidence that the 42$^d$ Congress that enacted the precursor of § 1983 thought that it was enacting the first, and at that time the only, federal damages remedy for the violation of federal constitutional and statutory rights by state governmental actors." Id. at 734.  "Congress thought that the declaration of rights in § 1981 would be enforced against state actors through the remedial provisions of § 1983." Id.

After Jett was decided, Congress passed the Civil Rights Act of 1991, which added subsection (c) to § 1981, which reads, "The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law."  The Fourth Circuit Court of Appeals has noted that it "do[es] not believe" that this amendment to § 1981 affects Jett's holding that, as against state actors, § 1983 provides the exclusive federal remedy for violations of rights protected in § 1981 and that "the § 1983 requirement that

31

plaintiffs show an official policy or custom of discrimination also controls in § 1981 actions against state entities." Dennis v. County of Fairfax, 55 F.3d 151, 156, 156 n.1 (1995) (citing Philippeaux v. N. Cent. Bronx. Hosp., 871 F. Supp. 640 (S.D.N.Y. 1994) as the "correct reading of the amendment").

Here, NCCU is a constituent institution of the University of North Carolina system, N.C. Gen. Stat. § 116-4, and an alter ego of the State of North Carolina, see Huang v. Bd. of Governors of Univ. of N.C., 902 F.2d 1134, 1138 (4th Cir. 1990); Roberson v. Dale, 464 F. Supp. 680, 689 (M.D.N.C. 1979).  As such, § 1983 is the exclusive remedy against NCCU for alleged violations of rights protected by § 1981.

As for the other defendants, who are sued in their individual capacities, there is an "absence of controlling precedent on the specific question whether § 1981 claims against government officials in their personal capacities are precluded". Windsor v. Bd. of Educ. of Prince George's Cty., Md., No. TDC-14-2287, 2016 WL 4939294, at *14 (D. Md. Sept. 13, 2016).  District courts within the Fourth Circuit have come down differently on this issue. Compare, e.g., Tucker v. Sch. Bd. of the City of Va. Beach, No. 2:13CV530, 2014 WL 5529723, at *13 (E.D. Va. Oct. 31, 2014) (adopting recommendation to dismiss the plaintiff's § 1981 claim against a state actor in her individual capacity because the plaintiff should have brought the claim under § 1983) and James v. Univ. of Md., Univ. Coll., No. PJM 12-2830, 2013 WL 3863943, at *2 (D. Md. July 23, 2013) (holding that no cause of action existed under § 1981 against the state actor sued

in his individual capacity) with Windsor, 2016 WL 4939294, at *14 (declining to dismiss the § 1981 claim against state actors sued in their individual capacities).

The Sixth Circuit Court of Appeals has directly addressed the issue and "conclude[d] that § 1983 is the exclusive mechanism to vindicate violations of § 1981 by an individual state actor acting in his individual capacity." McCormick v. Miami Univ., 693 F.3d 654, 661 (2012). The court relied on the Jett Court's analysis of the legislative history of § 1981 and enactment of the precursor to § 1983. Id. As noted above, "prior to § 1983, there was no legislation that provided a federal damages remedy against state actors who violated the law", and "Congress . . . enacted the precursor to § 1983 believ[ing] that it was enacting the first and only federal damages remedy against state actors." Id. The logic that "the more specific and express cause of action contained in § 1983 provided a mechanism to address a violation of § 1981" such that there is no private right of action under § 1981 against state actors "naturally extend[s] to the context of individual state actors sued in their individual capacity." Id. As the McCormick court explained, "Section 1983's express clause permitting these suits obviates the need to imply the same right under the general provisions of § 1981." Id.

In concluding otherwise, the Windsor court interpreted Jett as addressing issues involving the availability of liability resulting from respondeat superior and criticized the McCormick court for focusing exclusively on Jett while making no reference to the Civil Rights Act of 1991 and any effect it may have had on Jett's

application. 2016 WL 4939294, at *13-14.  As referenced above, though, the Fourth Circuit Court of Appeals noted in Dennis that the Civil Rights Act of 1991 did not affect Jett's admonition that § 1983 is the exclusive remedy against state actors for violations of § 1981 and the requirements of a plaintiff to show municipal liability.  Furthermore, the Dennis court did not have occasion to expound on the availability of § 1981 to suits against state actors in their individual capacity, as the plaintiff sued his county employer, not individual state actors.

With no controlling precedent, mixed lower court decisions as to a § 1981 remedy against individual state actors sued in their personal capacities, a Sixth Circuit Court of Appeals opinion squarely on point finding no remedy under § 1981 against such state actors, and absolutely no response from Howell on the issue, it is determined that Howell cannot maintain a § 1981 claim against the individual defendants sued in their individual capacities.  Therefore, Defendants' motion to dismiss Count 7 is granted, and there is no need to address Defendants' other challenge to the claim.

VI.

Next, Defendants argue that Howell's claim in Count 8 of wrongful discharge should be dismissed because the North Carolina Equal Employment Practices Act ("NCEEPA"), N.C. Gen. Stat. § 143-422.1 et seq., does not create a private right of action and that there is no individual liability for wrongful discharge. (Defs.' Br. in Supp. at 17, 19.)  In addition, Defendants argue, at least in the

heading of section IV of their brief, that the claim is otherwise barred by the

Eleventh Amendment. (Id. at 17, 19.)  In the body of section IV, though,

Defendants provide no argument in support of Eleventh Amendment immunity.

However, in a footnote to a previous section, Defendants argue the application of

the Eleventh Amendment not only to § 1981 claims, but to claims against a state

more generally. (Id. at 17 n.3.)  As above, Howell does not respond to this

challenge.  Accordingly, as noted above, the claim can be dismissed pursuant to

Local Rule 7.3(k); yet, addressing Defendants' argument also supports dismissal.

While Defendants are correct that the NCEEPA does not provide a private

right of action, a plaintiff may do as Howell has done here and bring a claim for

wrongful discharge in violation of the NCEEPA. See, e.g., Smith v. First Union Nat'l

Bank, 202 F.3d 234, 247 (4th Cir. 2000) (explaining that neither appellate court in

North Carolina had recognized a private cause of action under the NCEEPA but that

"most courts have applied the NCEEPA only to common law wrongful discharge

claims or in connection with other specific statutory remedies"); Arbia v. Owens-

Ill., Inc., No. 1:02CV111, 2003 WL 21297330, at *7 (M.D.N.C. June 4, 2003)

(stating that the NCEEPA does not provide a private right of action, but that North

Carolina state and federal courts have applied it to wrongful discharge claims).

Nevertheless, an action for wrongful discharge may be brought only against

an employer, not individuals in their individual capacities. Lorbacher v. Hous. Auth.

of City of Raleigh, 493 S.E.2d 74, 79 (N.C. Ct. App. 1997) (affirming dismissal of

the wrongful discharge claim "against the individual defendants as they were not

plaintiff's employers for the purposes of a wrongful discharge claim"), implicitly overruled on other grounds, Riley v. Debaer, 547 S.E.2d 831, 834-35 (N.C. Ct. App. 2001). This is true even when the individual is a plaintiff's supervisor. Johnson v. North Carolina, 905 F. Supp. 2d 712, 726 (W.D.N.C. 2012) (recognizing that "[p]ursuant to established North Carolina law", a wrongful discharge claim may be brought only against an employer, not the employer's agents); Di Wang v. WOW Brows, No. 1:14CV566, 2014 WL 5808370, at *2 (M.D.N.C. Nov. 7, 2014) (stating that wrongful discharge claims brought pursuant to the NCEEPA can only be brought against employers, not supervisors or employees); Arbia, 2003 WL 21297330, at *7 (stating the same and further explaining that the "NCEEPA does not apply to an employer's agents; rather, employers are the only covered entity"). Here, only NCCU is alleged to have been Howell's employer. (See Compl. ¶ 6 ("From on or about the 1st day of February, 2006 until the 5th day of June, 2014, Mr. Howell was employed by Defendant NCCU . . . .").) Therefore, this claim fails against the other Defendants because they are not alleged to have been Howell's employer.

Additionally, the Eleventh Amendment protects NCCU from Howell's wrongful discharge claim. See, e.g., Hooper v. North Carolina, 379 F. Supp. 2d 804, 814 (M.D.N.C. 2005) (finding that sovereign immunity barred the plaintiff's wrongful discharge claim against NCCU, among others); Dai v. Univ. of N.C. at Chapel Hill, No. 1:02CV224, 2003 WL 22113444, at *5 (M.D.N.C. Sept. 2, 2003) (finding that the plaintiff's wrongful discharge claim brought pursuant to the

NCEEPA against the state actor-defendants was barred by the Eleventh Amendment).  Therefore, Defendants' motion to dismiss Count 8 is granted.

                                    VII.

Finally, Defendants challenge Howell's claim in Count 9 that Defendants violated the North Carolina Wage and Hour Act ("the Act").  They argue that the Act does not apply to the State of North Carolina, its local agencies, or its instrumentalities of government, including NCCU. (Defs.' Br. in Supp. at 18.)  As with previous challenges, Howell does not respond.  Accordingly, as noted above, the claim can be dismissed pursuant to Local Rule 7.3(k); yet, addressing Defendants' argument also supports dismissal.

The Act provides, in relevant part, that "[e]very employer shall pay every employee all wages and tips accruing to the employee . . . ." N.C. Gen. Stat. § 95-25.6.  Yet, except for several provisions not applicable here, the Act explicitly exempts from its coverage "the State of North Carolina . . . or any State or local agency or instrumentality of government . . . ." N.C. Gen. Stat. § 95-25.14(d). NCCU is a constituent institution of the University of North Carolina System, N.C. Gen. Stat. § 116-4, and, as such, is an alter ego of the State of North Carolina, see Costello v. Univ. of N.C. at Greensboro, 394 F. Supp. 2d 752, 756 (M.D.N.C. 2005).  Therefore, NCCU is exempted from the relevant provisions of the Act. And, as noted above, NCCU is the only Defendant alleged to have been Howell's employer.  Defendants' motion to dismiss Count 9 is granted.

                                     37

VIII.

For the reasons stated herein, IT IS HEREBY ORDERED that Defendants'

Motion to Dismiss [Doc. #17] is GRANTED.  A judgment dismissing this action will

be filed contemporaneously with this Order.

This the 5th day of July, 2017.


                                        /s/ N. Carlton Tilley, Jr.
                                        Senior United States District Judge